**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CREATIVE TRADE GROUP, INC, <br> a Connecticut Corporation, | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | |
| v. | ) <br> ) | No. 08 C 2561 |
| INTERNATIONAL TRADE ALLIANCE, INC., <br> a Florida Corporation, and <br> McGRATH-COLOSIMO, LTD d/b/a <br> McGRATH LEXUS OF CHICAGO, <br> an Illinois Corporation, | ) <br> ) <br> ) <br> ) <br> ) <br> ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In May 2008, Plaintiff Creative Trade Group, Inc. ("Creative")[1] filed a complaint in this court

against Defendants, International Trade Alliance, Inc. ("ITA") and McGrath-Colosimo, LTD

("McGrath"), alleging that ITA and McGrath wrongfully retained $171,388 that Creative wire-

transferred for the purchase of two rare Lexus luxury SUVs. Creative demanded its money back

after the car deal, which involved a number of intermediaries, fell apart. Creative admits it had no

agreement directly with Defendant McGrath, the car dealership who possessed the desired SUVs

and to whom Creative wired the money. Creative now seeks summary judgment against McGrath

on claims of conversion, unjust enrichment, and violation of the Illinois Consumer Fraud and

Deceptive Practices Act. The relief Creative seeks includes the return of its $171,388, additional

damages it claims to have suffered as a result of its inability to resell the SUVs, and punitive

damages. For reasons stated herein, the court denies Plaintiff's motion for summary judgment [68]

on all claims. Plaintiff also moves to strike Defendant's Local Rule 56.1 Response and attached

---

[1] Because a number of other parties in this case are referred to by initials, the court
uses "Creative" rather than Plaintiff's preferred acronym, CTG.

affidavits. That motion is granted with respect to McGrath's 56.1 Response, but denied with respect to the attached affidavits.

## BACKGROUND

The facts lie before the court "in a tangled web." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 (7th Cir. 2006). Despite Plaintiff's repeated insistence that "this is actually a very simple case," the court concludes it is anything but simple. (Pl.'s Reply, at 8.) To begin, Plaintiff's claims arise from a complicated transaction, the nature of which Plaintiff has been unable or unwilling to reveal to the court in full detail. Defendants, for their part, have failed to meet reasonable deadlines or provide appropriate citations. What does emerge from the record, however, are multiple, though incomplete, versions of the exchange in question. On summary judgment, the court's task is to determine "whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In evaluating the record in the light most favorable to Defendant, as non-moving party, the court notes that "multiple versions of facts increase the chances that at least one of those conflicting facts will be material to the outcome of the case." *Pourghoraishi*, 449 F.3d at 754.

All of the parties in this case appear to be links in the same supply chain. Plaintiff Creative is an intermediary which identifies and buys sought-after vehicles that it then exports and resells to purchasers in Eastern Europe, primarily Ukraine. (Katz Dep. 9-11.)[2] Creative's sole owner and director is Gregory Katz, a resident of Connecticut. If the transaction at issue in this case is representative, there are many brokers in the world of international luxury automobile sales. One

---

[2] The court is satisfied that it has diversity jurisdiction in this case. More than $171,388 is in controversy. Creative is a Connecticut corporation in the business of purchasing and exporting automobiles and boats, with its principal place of business in Connecticut, though most of Creative's end purchasers are located in Eastern Europe. (Pl.'s 56.1 ¶ 1.) Defendant International Trade Alliance, Inc. ("ITA") is a Florida corporation in the business of brokering and facilitating automobile purchases, with its principal place of business in Florida. (*Id.* at ¶ 2.) Defendant McGrath-Colosimo, LTD ("McGrath") is a car dealership, incorporated in Illinois, with its principal place of business in Illinois. (*Id.*)

such broker is TVD Global Trade USA, LLC ("TVD Global"), a Nevada corporation, owned by Valeriy Pychnenko. Pychnenko's country of citizenship is not immediately ascertainable from the record, but statements of the parties suggest he is of Russian origin and likely resides in Canada. (Przybylski Dep. 48:3-5; Katz Dep. 23:11-24.) Brokers rely on their relationships with car dealers and other brokers to locate popular vehicles, which they then either purchase themselves and resell or broker to other buyers for a commission. (Pl.'s 56.1 ¶ 2.; Katz Dep. 34-37.)[3] Defendant ITA is also a broker. Defendant McGrath is a car dealership in the traditional sense, selling vehicles to the general public and to brokers such as ITA. (Pl.'s 56.1 ¶ 3-4.)

In December 2007, Katz approached Pychnenko at TVD Global about the prospect of obtaining a number of 2008 Lexus LX570 SUVs, a highly sought-after model of luxury automobile. (Katz Dep. 29-30.) In response to Katz's request, Pychnenko forwarded to Katz a promotional e-mail that Pychnenko had received from Yaroslav Farber, president and co-owner of ITA. (Pl.'s 56.1 ¶ 6.) Plaintiff has submitted a purported copy of that e-mail to the court. (Ex. I to Pl.'s 56.1 Stat.)[4] According to Plaintiff's Exhibit I, the e-mail (which was partially written in Russian) advertised the immediate availability of two 2008 Lexus LX570 SUVs at a cost of approximately $87,000 each with payment required in full. (E-mail, Ex. I to Pl.'s 56.1 Statement at 2.) Farber, who was born and educated in Russia but currently resides in Florida, testified that the promotional e-mail was sent only to ITA's past customers, one of which was TVD Global. (Farber Dep. 14-15; Farber Dep.

---

[3]     Several of the organizations involved in this transaction have on occasion reorganized themselves and begun doing business under new names. For example, Gregory Katz testified that Creative was incorporated in 2006, but operated for two years before that. (Katz Dep. at 11-12.) Leszek Prybylski, part owner of ITA, testified that before he established ITA in approximately 2005, he engaged in substantially the same business under the name LP Motors. (Przybylski Dep. at 12.) Yaroslav Farber, part owner and president of ITA, previously engaged in the same business under the name International Alliance. (Farber Dep. at 15.) Creative itself is a small operation, with a single owner and no employees, that is run out of a "virtual office" in Katz's home. (Katz Dep. at 8.)

[4]     Without elaborating, Defendant disputes whether Plaintiff's Exhibit I is a true and correct reproduction of Farber's e-mail. (Def.'s 56.1 ¶ 6.)

55:10-16.) The parties agree that ITA did not solicit business directly from Creative nor contact Creative directly in any way. Though Farber's e-mail makes no mention of it, the advertised SUVs were apparently expected to be supplied by McGrath, a regular supplier for ITA's transactions. (Farber Aff, ¶ 9, Ex. E to Def.'s 56.1 Resp.)[5]

TVD Global had done business with ITA in the past, and Creative alleges that Pychnenko represented to Katz that Creative could rely on Pychnenko's contacts with ITA (and, in turn, ITA's contacts with McGrath) to obtain the SUVs advertised in the e-mail. (Katz Aff.¶ 4-6, Ex. A to Pl.'s 56.1 Statement.) Based on Pychnenko's assurances, Creative alleges, Katz and Pychnenko entered into an oral agreement for the purchase of the two Lexus automobiles for a total price of $177,000, whereby Creative would pay the sales price of $171,388 directly to McGrath and a finder's fee of $5,612 to TVD Global upon delivery of the cars. (Aff. Katz. ¶ 5-7, Ex. A to Pl's Rule 56.1 Stat.) ITA's principals deny having any knowledge of such an agreement. (Farber Aff., ¶ 9, Ex. E to Def.'s Rule 56.1 Resp.) Defendant McGrath's principals likewise deny having knowledge of any contract. (Simon Aff., ¶ 5-6, ¶ 8-9, Ex. A to Def.'s 56.1 Resp.) The parties do not dispute that Pychnenko and TVD Global had no authority to enter into contracts on behalf of ITA or McGrath. Creative concedes that it had no contract of any kind directly with ITA or McGrath. (Pl.'s Mem. at 14-16.)

According to Creative, it entered into a separate agreement with its own "long standing customer," Hazel U.K., in reliance on Pychnenko's promises. Under the terms of that agreement, Creative was obligated to supply two 2008 Lexus LX570 SUVs and to ship them to Hazel U.K.'s

---

[5] According to Farber, both he and Pychnenko "understood that the vehicles would not necessarily come from McGrath because a delay in payment by Mr. Pychnenko could easily have resulted in one of [the desired] vehicles being ordered from the manufacturer by some other dealership." (Farber Aff, ¶ 9, Ex. E to Def.'s 56.1 Resp.) It is unclear from Farber's testimony whether this was a description of a standard industry practice or comments on the specific terms of this deal.

own customer, an unidentified buyer in Ukraine. (Pl.'s 56.1 ¶ 11.) Creative alleges that Hazel U.K. or its buyer prepaid the sale, and that Creative stood to make a $2,000 commission on the transfer. (Katz Aff. ¶ 8-9 Ex. A to Pl's 56.1 Statement.) Hazel U.K., has, in fact, dissolved as an entity since the alleged transaction took place. Although Creative presented the court with an assignment of rights from Hazel U.K. in order to pursue this litigation, Creative has never clearly articulated which entity prepaid the sale, nor has Creative disclosed the identity of the intended final buyer in Ukraine. The evidence before the court does not establish where the $171,388 that was ultimately transferred between the parties originated, whether with Creative, Hazel U.K., or some other entity.

Following his negotiations and agreement with Katz, Pychnenko contacted Farber at ITA and offered to purchase a block of four automobiles. Among the four were the two vehicles Creative requested, though Farber testified he was unaware of Creative's involvement in the deal. (Farber Dep. 53:1-6; Farber Aff. ¶ 8, Ex. E to Def.'s 56.1 Resp.) In January 2008, Farber sent a reply e-mail to Pychnenko, instructing him to wire $342,726.00, the agreed price for the four cars, directly to McGrath's business account.[6] (Id.) The e-mail, dated January 14, 2008, was directed and addressed only to Pychnenko and contained an account number for McGrath Lexus of Chicago at MB Financial Bank in Oak Brook, Illinois. (E-mail, Ex. J to Pl.'s Rule 56.1 Stat.)[7] The e-mail lists four vehicles and sets forth the total purchase price of $342,726, but makes no reference to Creative. (Id.)

Creative alleges that Pychnenko forwarded Farber's e-mail to Katz. (Pl.'s 56.1 ¶ 13.) Then,

---

[6]     ITA had been a repeat customer of McGrath for more than 10 years and the two companies had established a process by which ITA could wire transfer funds into McGrath's account and later direct McGrath on how to apply the funds. (Przybylski, Dep. at 20-24; Simon Dep., at 12). ITA also occasionally told its customers to wire funds directly to McGrath on ITA's behalf, with the understanding that ITA would later direct McGrath to apply the funds to the purchase of the car the customer desired. (Przybylski Dep., at 20-24.)

[7]     Without elaborating as to why, McGrath denies that Plaintiff's Exhibit J is a true and correct copy of Farber's e-mail. (Def.'s Rule 56.1 Resp., at ¶ 12.) For reasons stated in the next section, the court disregards Defendant's unsupported contention.

at Pychnenko's direction, Katz wired $171,388 from Creative's account at People's United Bank in Connecticut to the McGrath account listed in the e-mail, apparently with the expectation that the wired funds would be accepted as payment for the two Lexus SUVs Creative wanted. (*Id.* ¶ 13-15.) On January 18, 2008, MB Financial Bank logged an incoming wire transfer in the amount of $171,388 to McGrath's account, originating from Creative Trade Group's account at People's United Bank. (Transfer Document, Ex. M to Pl.'s Rule 56.1 Stat.) The wire transfer document, under the heading "Beneficiary Info," reads : "FOR ITA," followed by two six digit numbers. (*Id.*) Creative alleges that Katz attempted to identify the two desired automobiles by writing the last six digits of the Vehicle Identification Numbers ("VIN") on the face of the wire transfer document. (*Id.* at ¶ 15.) Mike McGrath, general manager of the McGrath dealership, stated that it is not the dealership's regular practice to identify vehicles by the last six digits of the VIN and suggested that a recipient of the transfer document would not know to what the numbers referred. (McGrath Aff. ¶ 5, Ex. B to Def.'s 56.1 Resp.) Creative concedes that at no time prior to making the wire transfer did it make any further effort to contact McGrath or ITA to give either Defendant any directions with regard to the funds.

According to bank records reviewed by Luz Russell, the Legal Research Representative at People's United Bank, shortly before Creative wired its payment to McGrath's account on January 18, 2008, Creative's account was the recipient of an incoming wire transfer. (Russell Aff. ¶ 8-9, Ex. G to Def.'s Rule 56.1 Resp.) The transfer, in the amount of $182,290, originated at a Cyprus branch of a Ukraine-based bank, named Privat Bank, under the account of "Hazel U.K. Limited Companies House." (*Id.*) McGrath's investigator, John William Bennett, has learned that Hazel U.K. is a company registered with the British government. (Bennett Aff. ¶ 5, Ex. C to Def. 56.1 Resp.) The company maintains no publicly available telephone or fax numbers, however, and its registered address in the United Kingdom is in fact the address of a different company called Anglo Offshore Ltd. (*Id.* at ¶ ¶ 12, 16, 17). Anglo Offshore Ltd. is a UK-based company that registers the

6

companies of non-British residents with the British government for a fee. (*Id.* at ¶ 15.) According to Bennett, Hazel U.K. maintains no offices at the Anglo Offshore address, and Anglo Offshore plays no day-to-day role in Hazel U.K.'s operations. (*Id.* ¶ 19.) Hazel U.K.'s sole registered director is a British national named Francis Mondon. (*Id.* at ¶ 7.) Mondon's listed address is in the Republic of Seychelles, an archipelago nation of 115 islands in the Indian Ocean. (*Id.*) Mondon has recorded approximately 68 other company appointments in the United Kingdom, one of which lists his occupation as "caterer." (*Id.* at ¶ 8.) Further, McGrath presents evidence in the form of an affidavit from Russian translator Dmitri Farber[8] that the contract—drafted in Russian—that Creative describes as "representative of the agreement" between it and Hazel U.K. is in fact an entirely different agreement between Creative and a company named Sozidatel-Avto. (Pl.'s Reply at 7; D. Farber Aff ¶ 8, Ex. D to Def. 56.1 Resp.) McGrath does not present a full English translation of the contract. Dmitri Farber describes only the signature page, which lists Sozidatel-Auto as "buyer" and Creative as "seller." (D. Farber Aff ¶ 8, Ex. D to Def. 56.1 Resp.) Neither party attempts to explain what kind of company Sozidatel-Avto is or what its involvement in the transaction, if any, may have been.

McGrath also presents the affidavit of Ukranian law expert Clifford Dammers; Dammers describes Ukraine's exchange control system, which imposes a series of import restrictions on goods like automobiles. (Dammers Aff., ¶ 6 Ex. G to Def.'s 56.1 Resp.) Dammer's affidavit suggests that the prepaid transaction giving rise to Creative's claims may run afoul of Ukraine's import restrictions. (*Id.*, ¶ 6-12.) Other than Dammers' affidavit, the parties do not address how trade restrictions in either Ukraine or the United States might have operated to limit or prohibit the transaction at issue.

Katz stated that, following the wire transfer, he sent a facsimile letter to McGrath on January

---

[8]     It is not clear to the court whether Dmitri Farber bears any relation to Yaroslav Farber, president of Defendant ITA.

22, 2008, directing McGrath to apply the funds to the purchase of the two Lexus SUVs. (Katz Aff. ¶ 15.) A purported copy of that fax, signed by Katz and dated January 22, 2008, is in the record. (Ex. 5 to Katz Aff.) The fax reads: "Please apply the wire transfer in the amount of $171,388.00 received on Friday, January 18, 2008 from Creative Trade Group, Inc. towards purchase of [two 2008 LX 570s] on behalf of ITA." (*Id.*) It is not clear from the record how Katz might have obtained McGrath's fax number, which does not appear on the document, nor is there evidence that shows whether Katz received any confirmation that the letter was properly transmitted or received. McGrath's principals deny having ever received such a letter. (Simon Aff. ¶ 4, Ex. A to Def.'s 56.1 Resp.; McGrath Aff. ¶ 7, Ex. B to Def.'s 56.1 Resp.) Instead, McGrath's sales manager Michael Simon testified that, after McGrath received the $171,388 wire transfer, he called Leszek Przybylski, part-owner of ITA, and sought instructions on how to apply the funds. (Simon Dep. at 21-24.) In response, Przybylski faxed a letter instructing Simon to credit the funds toward other cars purchased under ITA's general account. (Przybylski Dep. at 39.) A copy of that fax is in the record. (Ex. O to Pl.'s 56.1 Stat.) The facsimile letter is signed by Przybylski and addressed to McGrath Lexus of Chicago. (*Id.*) It reads: "Please apply the balance of the wire dated 1/18/08 to the following cars . . .," and then lists three vehicles unrelated to Creative's alleged request. (*Id.*) The letter is not dated.

According to Przybylski and Farber (ITA's owners), the reason for this instruction was Pychnenko's mounting debt. During the course of their four-year business relationship, Pychnenko had racked up approximately $700,000 in unpaid debt to ITA, and the two were in discussions to settle his outstanding balance. (Farber Dep., 37:3-7; Przybylski Dep. at 32-34.) Pychnenko had promised that he would wire payments to ITA as money became available. (Przybylski Dep. at 33-35.)

Przybylski testified that he believed the January 18 wire transfer came exclusively from Pychnenko as a partial payment on his outstanding debt. (*Id.* at 39.) This continues to be

8

Przybylski's understanding, based on Pychnenko's own representations. "I still understand this is the money, Pyshnenko [sic] money, not anybody else," Przybylski said. "I don't know why he put Creative. Maybe as part of his company, I don't know, but this is money–the money belongs to Pyshnenko [sic]. . ."[9] (*Id.* at 32.) When asked follow-up questions about the basis for his belief that Pychnenko, not Katz, was the origin of the payment, Przybylski testified: "I'm positive about it. . . [because] [h]e [Pychnenko] tell us." (*Id.* at 33.) According to Przybylski, it was Pychnenko's regular practice to wire money to ITA using other companies as intermediaries. (*Id.* at 41.)[10]

Przybylski's account conflicts to some extent with the affidavit and testimony of Yaroslav Farber, his partner at ITA. According to Farber, Pychnenko confirmed the wire transfer with Farber on January 18, 2008, and explicitly communicated that the money was intended as payment on two of the four vehicles Pychnenko had previously offered to buy. (Farber Aff., Ex. E to Def.'s Rule 56.1 Resp., at ¶ 12.) Farber agreed with Przybylski, however, that Pychnenko made no mention of Creative. (*Id.*) Farber viewed payment on only two vehicles as inconsistent with Pychnenko's initial offer to purchase four automobiles. (*Id.* at ¶ 13.) Given that inconsistency and concerns about Pychnenko's continuing creditworthiness, Farber took steps to terminate ITA's business relationship with Pychnenko and arranged to satisfy Pychnenko's outstanding debt. (*Id.*) According to Farber, it was as part of these steps that Przybylski directed McGrath to apply the $171,388 payment toward ITA's account. Like Pryzbylski, Farber testified that the funds wired to McGrath originated

---

[9]     Przybylski spent much of his life in Poland, and it is apparent from a reading of his deposition transcript that he is less than completely fluent in English, the language in which his deposition was conducted. Przybylski's difficulty understanding some of the questions asked of him and his questioner's difficulty understanding some of his responses resulted in considerable confusion during his deposition. (*See, e.g.,* Przybylski Dep. at 45-46.)("Q: Okay. So, at that point then did you call somebody at McGrath and tell them that you don't know anything about this, or what was your response?  A: No respond at all.  Q: Excuse me?  A: No response.  Q: Notice him?  A: No, I don't respond . . . .)

[10]     Przybylski's exact words were: "[T]hat's what I understand, the money belongs to him . . . [A]nd that he send it, like always, from different companies."

from Pychnenko, not Katz. "During our years working with TVD," Farber testified, "the–mostly where [sic] received payments from other companies, and very rarely from TVD. [T]hat's why I can make an assumption the companies TVD and [Creative] are the same company." (Farber Dep. at 61.)

McGrath denies having any knowledge of Creative's existence or of any dispute over the wired funds until February 13, 2008,[11] when Michael Simon, McGrath's sales manager, received a letter and telephone call from Glenn Seiden, who now represents Plaintiff. (Simon Dep. 51:10-15.) Seiden initially represented himself as the attorney for Pychnenko and TVD Global and made conflicting demands; first Seiden insisted that the vehicles be sent to TVD Global immediately and then he insisted that the money be returned to Creative's account. (Simon Aff. ¶ 5, Ex. A to Def.'s Rule 56.1 Resp.) According to copies of letters provided by McGrath, as late as March 24, 2008 (two months before he filed this suit on behalf of Creative), Seiden was still sending demand letters on behalf of TVD Global and Pychnenko to Defendant ITA. (Letter, Ex. 1 to Ex. E to Def. 56.1 Resp.)

In their initial February 2008 communication, Simon told Seiden he had never heard of Pychnenko, TVD Global, Creative or Katz, and informed Seiden that McGrath had no record of any purchase orders from those entities. (Simon Aff., ¶ 5. Ex. A to Def.'s Rule 56.1 Resp.) Simon then undertook an investigation, at the direction of General Manager Mike McGrath, to determine the merits of Seiden's allegations. (*Id.* at ¶ 9.) Simon first contacted ITA. Przybylski told Simon that there had been a misunderstanding, but that ITA would "get it straightened out." (Simon Dep. 52:4-14.) Przybylski further advised Simon that ITA had no dealings with Katz or Creative, but that it had previously done business with Pychnenko. Przybylski told Simon that the wire payment originated

---

[11]    McGrath's brief actually notes the date of its contact with Seiden as February 13, 20*09,* but, given that the litigation commenced prior to that date, the court feels safe in assuming that the '09 is a typo.

with Pychnenko and claimed the $171,388 as satisfaction of Pychnenko's outstanding debt to ITA. (Simon Aff. ¶ 6, Ex. A to Def.'s Rule 56.1 Resp.) According to Simon, ITA was "used to Mr. Pychnenko, who is apparently not a US national, making payments from different offshore and US bank accounts and/or through different offshore and US entities." (*Id.*) On that basis, Przybylski affirmed his previous instructions to credit the $171,388 to ITA's account with McGrath.

Simon relayed ITA's position to Seiden, and the two continued to have near-daily contact in an attempt to resolve the dispute. (*Id.* at ¶ 6-10.) According to Simon, however, Seiden could not provide "any proof of the initial origin of the funds in question such that a determination could be made whether TVD and/or Pychnenko funneled money through [Creative's] account from either inside the US or from abroad." (*Id.* at ¶ 9.)

Ultimately, McGrath refused to ship the two SUVs or return the wired funds to Creative. Creative filed a complaint against ITA and McGrath in this court in May 2008, but did not join TVD Global or Pychnenko as a party to the case. ITA subsequently filed a counterclaim and a third-party complaint against TVD Global and Pychnenko, effectively serving process on TVD Global's registered agent in Nevada on August 19, 2008. Pychnenko, however, could not be located to effectuate service of process.

In 2009, ITA filed for bankruptcy. Proceedings against ITA are stayed, but the court now turns to Plaintiff's motion for summary judgment against Defendant McGrath. In addition, the court will address Plaintiff's motion to strike portions of Defendant McGrath's Local Rule 56.1 Response and attached affidavits. For the reasons explained here, Plaintiff's motion to strike is granted in part and denied in part, and Plaintiff's motion for summary judgment is denied as to all claims.

<u>**DISCUSSION**</u>

**A.    Motion to Strike Defendant McGrath's Local Rule 56.1 Response**

Plaintiff first moves to strike from the record Defendant's Local Rule 56.1 Response because it fails to comply with the requirements of the local rules. Local Rule 56.1 requires that a

party opposing summary judgment make specific references to the record or other materials to support its disagreements of fact. U.S.DIST.CT.RULES N.D. ILL. R. 56.1(b)(3). Ensuring compliance with the local rules serves an important function in organizing the evidence and identifying the disputed facts. *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005). The court has discretion in determining how to enforce the local rules and whether to apply them strictly or to overlook a party's transgression. *Id.*

Defendant's Rule 56.1 Response is disappointing. In some places, Defendant makes no attempt to cite the portions of the record it claims support its position. (Def. 56.1 ¶ 17.) Elsewhere, Defendant cites the record incorrectly and even occasionally leaves blank spaces in quotation marks where its citations should be, giving the appearance that the response is only half finished. (Def.'s 56.1 ¶ 4-5.)

The court is not inclined to search the record to make sense of Defendant's claims and allegations. As frustrated courts have observed, "Judges are not like pigs, hunting for truffles buried" in the record. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004). Accordingly, the court grants Plaintiff's motion and strikes Defendant's vague and incomplete Local Rule 56.1 Response in its entirety. This ruling does not, however, require that the court resolve the summary judgment motion in Plaintiff's favor. Failure to comply with Rule 56.1(b) does not result in an automatic grant of a motion for summary judgment; rather, the court must still evaluate all facts in the light most favorable to the non-moving party. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The ultimate burden of persuasion remains with the Plaintiff to demonstrate that it is entitled to judgment as a matter of law. *Id.*

**B.    Defendant McGrath's Proffered Affidavits**

Plaintiff also moves to strike the several affidavits proffered by Defendant to defeat summary judgment. Plaintiff's attacks on the affidavits basically fall into three distinct categories: (1) Plaintiff

claims the affidavits of Yaroslav Farber, Michael Simon, and Mike McGrath are inconsistent with those individuals' sworn testimony at their depositions; (2) Plaintiff claims the affidavits of John William Bennett, Luz Russell, and Clifford Dammers present new evidence that was not properly disclosed during discovery; and (3) Plaintiff claims the affidavits set out facts that would not be admissible in evidence. As explained briefly below, the court finds little merit in any of these arguments.

Plaintiff first claims that the affidavits of Farber, Simon, and Mike McGrath are inconsistent with those individuals' sworn deposition testimony. As a general rule, a party cannot defeat summary judgment by having a witness contradict her own prior testimony. *Patton v. MFS/Sun Life Financial Distributors, Inc.*, 480 F.3d 478, 488 (7th Cir. 2007). "When a witness abandons her testimony in the face of a pending summary judgment motion, the change is often a transparent ruse to prolong the case; allowing the ruse to succeed would defeat summary judgment's purpose of weeding out clearly unmeritorious cases." *Id.* In some instances, however, a change in testimony is properly before the court, such as when the deposition testimony was ambiguous or incomplete or when the questions posed were confusing. *Id.*

Plaintiff broadly asserts that Defendant's relied-on affidavits attempt to "rewrite history" by contradicting prior sworn testimony and presenting new evidence not disclosed in the various depositions. (Pl's Reply at 4.) Plaintiff fails to point to a single direct contradiction between the individuals' affidavits and their prior sworn testimony, however. In the court's view, the affidavits amplify and clarify the affiants' deposition testimony, but do not conflict with that testimony. For example, Mike McGrath testified at his deposition that, after he learned of the dispute over the wired funds, he "asked [his sales manger] Mr. Simon look [sic] into the matter and have it resolved or tell me that it was unresolvable so I could contact my counsel." (McGrath Dep. 16:2-4.) In his affidavit, Mike McGrath stated, "I had delegated the task of interviewing all relevant parties and conducting an appropriate investigation to my General Sales Manager Mike Simon." While the phrase

"delegated the task of interviewing. . ." is arguably more specific than the phrase "asked [him to] look into the matter," the two phrases cannot be said to be inconsistent. The greater level of clarity and specificity in the affidavits appears to be nothing more than the natural result of deposition answers being given extemporaneously and deposition questioning being incomplete or confusing.[12]

Plaintiff next argues that Defendant's reliance on the affidavits of Bennett, Russell, and Dammers is improper because Defendant did not disclose the affiants as potential witnesses or the information contained in those affidavits during discovery, thereby depriving Creative of the opportunity to learn the potential facts contained therein. The court is unmoved. The three affidavits contain nothing more than information that is or should have been known to Plaintiff independent of any disclosure. They are, in fact, the product of Defendant's investigations into Creative's own claims. The information uncovered in attempting to confirm the location and existence of Creative's purported buyer and financier (Hazel U.K.) cannot come as a surprise to Creative, which claims to have a long-standing relationship with Hazel U.K. and which presented this court with an assignment of rights from Hazel U.K. in the context of this case.[13] Nor can the court imagine how Creative was deprived of the opportunity to learn about its own bank account activity, the facts attested to by Russell, a representative of Plaintiff's bank. Dammers's affidavit describes the various import restrictions on goods to Ukraine; such information should also be well known to Plaintiff, which is in the very business of exporting expensive goods to Ukraine.

In short, Plaintiff suffers no prejudice by Defendant's attempts to independently confirm

---

[12]     The court notes that Farber's deposition was conducted through the use of a Russian translator, a circumstance that makes some degree of confusion practically inevitable and explains the need for an affidavit.

[13]     Assuming the facts in Bennett's affidavit are true, it is exceedingly curious that Plaintiff was able to obtain an assignment from a now-defunct company with no address and a lone director who resides in the Republic of Seychelles.

Plaintiff's claims. If Creative wishes to contest the truth of the affidavits' assertions, it may do so in the context of a trial on the merits.

Lastly, Plaintiff argues the affidavits relied on by Defendant do not meet the standards of evidence necessary to permit the court to consider them on summary judgment. Evidence submitted in a summary judgment briefing must be admissible at trial under the Federal Rules of Evidence, although attested testimony, such as that found in depositions or affidavits, will also be considered. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show the affiant is competent to testify on the matters stated." FED. R. CIV. P. 56(e).

Again Plaintiff provides no specifics and instead states in broad terms, "portions of the affidavits . . . are based on hearsay, not supported by personal knowledge, conclusory and contradictory to the affiants' sworn deposition testimony. . . ." (Pl.'s reply at 6). The affidavits themselves are all duly sworn and all purport to be based on the personal knowledge of the affiants. Plaintiff's motion to strike Defendant's facially-valid affidavits is denied.

## C.    Legal Standard on Summary Judgment

The court turns to Plaintiff's motion for summary judgment against Defendant McGrath. Such a motion should be granted only where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(c); *Hemsworth*, 476 F.3d at 489-490. In considering Plaintiff's motion, the court must evaluate the evidence in the light most favorable to Defendant and may not make credibility determinations or weigh evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).

## D.    The Effect of Defendant McGrath's Default

Before the court can determine whether a dispute of material fact necessitates trial, it must

address the consequences of McGrath's procedural default in response to Plaintiff's requests to admit. Under Fed. R. Civ. P 36(a), a matter is deemed admitted unless the party to whom the request is directed responds within 30 days, absent leave of the court or an agreement between the parties. On July 11, 2008, Plaintiff served Defendant McGrath with certain requests to admit, in accordance with the requirements of Fed. R. Civ. P. 36. McGrath failed to timely respond to these requests, not tendering its answers to Plaintiff until September 10, 2008, one month late. As a consequence of McGrath's untimely response, Plaintiff asks that the matters be deemed admitted and that the court render summary judgment on that basis. Defendant requests that the court treat its response of September 10, as a motion to withdraw its default admissions. *See Chisholm v. Cancer Treatment Centers of America*, No. 01 C 0947, 2002 WL 31085090 at *2 (N.D. Ill. 2002) (untimely response deemed a motion to withdraw default admissions).

As this court has previously observed, Rule 36 is self-executing, meaning that an admission is automatically established by operation of the rule, with no court intervention required. *See Matthews v. Homecoming Financial Network*, No. 03 C 3115, 2006 WL 2088194 at *2 (N.D. Ill. 2006). The court, nevertheless, has discretion to permit Defendant to withdraw or amend its admissions if doing so would promote the presentation of the merits of the action and would not prejudice the requesting party. Fed. R. Civ. P. 36(b). In this situation, prejudice is not established merely because "the party who obtained the admissions will now have to argue the merits of the case." *Paymaster Corp. v. California Checkwriter Co.*, No. 95 C 3646, 1996 WL 543322 at *2 (N.D. Ill. 1996). Rather, prejudice must be based on the party's detrimental reliance on such admissions. *Id.*

Plaintiff Creative has presented no meaningful argument that it would suffer prejudice based on its reliance. Prior to its tardy response to the request for admission, Defendant McGrath had already denied the very same claims advanced by Plaintiff's request in its answer to the initial complaint. Further, substantial discovery had already occurred prior to Defendant's untimely

16

response, and Defendant's agents effectively denied the substance of Plaintiff's request in the context of that discovery. For example, in his deposition on August 11, 2008—a single day after the deadline for Defendant's response—Michael Simon, McGrath's sales manager, denied the substance of Plaintiff's requests to admit (i.e. whether McGrath and Creative had ever entered a contract, and whether McGrath received Creative's fax of January 22, 2008). The record demonstrates that Plaintiff conducted itself throughout discovery under the assumption that Defendant would, in fact, deny the requests to admit on which Plaintiff now attempts to rely in support of its motion for summary judgment. In any event, Plaintiff had plenty of time throughout the discovery process to correct any harm it might have suffered as a result of Defendant's tardy response. Defendant McGrath's default admissions are deemed withdrawn.

**E.    Questions of Material Fact and Judgment as a Matter of Law**

Creative seeks summary judgment on each of its claims against McGrath: conversion, unjust enrichment, and violation of Illinois' consumer fraud law. The court addresses those claims in turn.

**1.    Conversion**

Under Illinois law, an action for conversion "may not be maintained to satisfy a mere obligation to pay money." *In re Thebus*, 108 Ill.2d 255, 259-60, 483 N.E.2d 1258, 1260 (1985). Money may be the subject of a conversion claim, "but it must be capable of being described as specific chattel." *Id.* To be specific chattel, money need not be "segregated or earmarked, but it must at least be a specific fund or specific money in coin or bills." *Safeco Ins. Co. v. Wheaton Bank and Trust Co.*, No. 07 C 2397, 2009 WL 2407740, *3 (N.D. Ill. Aug. 4, 2009)(internal citations omitted); *In re Thebus*, 108 Ill.2d at 262, 483 N.E.2d at 1261 ("[T]here is no requirement that the withheld funds be segregated from the . . . general funds or that they be deposited in a special bank account."). "Money is a specified and identifiable fund when it is not an estimate but rather a specific amount transferred to [the defendant] from an outside source." *LFG, LCC v. Navarre*, No.

01 C 9451, 2002 WL 1379112, *3 (N.D. Ill. June 26, 2002)(collecting cases).  For the purposes of this motion, the court assumes the wire transfer fund, which is a specific and documented amount of money ($171,388) transferred to McGrath from an outside source (Creative's account), is sufficiently identifiable to support Creative's conversion claim.

Plaintiff must still establish the other elements of conversion: (1) defendant's unauthorized or wrongful assumption of control, dominion, or ownership over a plaintiff's personal property; (2) plaintiff's right in the property; (3) plaintiff's right to immediate possession of the property, absolutely and unconditionally; and (4) plaintiff's demand for possession of the property. *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).  Thus to prevail on this motion, Plaintiff must establish that its right to the property in question is undisputed.

Creative has failed to do so in this case.  Viewing the evidence in the light most favorable to McGrath, the court finds that a sufficient question of fact exists as to whether the $171,388 wired from Plaintiff's account on January 18, 2008 did, in fact, originate from and belong to Plaintiff.  Both Yaroslav Farber and Leszek Przybylski testified that it was Valeriy Pychnenko's common practice to funnel his payments to ITA through other companies from offshore bank accounts.  They also testified that, based on Pychnenko's representations, they continue to believe the money wired on January 18, 2008 originated with Pychnenko, who used Creative as his conduit.

The inference that the wired money did not originate with Creative is a reasonable one, given the circumstances of the business transactions at issue in this case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-42 (1986) (on summary judgment, courts ought to allow inferences that are reasonable and present a sufficient disagreement to require submission to a jury).  The companies involved in this exchange are not indelible fixtures with long, stable histories and meticulous bookkeeping.  They reincorporate frequently and change their names.  They wire hundreds of thousands of dollars in cash from one international bank account to another, having only minimal contact with parties with whom they deal and maintaining only cursory records of their

18

exchanges.

In that context, Luz Russell's affidavit, stating that Creative received a wire transfer for a large sum of money from a bank account in Cyprus just moments before it wired a similar sum to McGrath, raises uncertainty.  The wire came from an account tied to Hazel U.K.—a company that John William Bennett, a former Head of Criminal Investigation for the United Kingdom Police Service, suggests only nominally exists.  If Bennett's allegations about the nature of Hazel U.K. are true, Hazel U.K. may be nothing more than a shell company, either of Pychnenko or of some other entity.  Notably, Defendant has presented evidence that attorney Glenn Seiden, who now represents Plaintiff, was apparently acting on behalf of both Pychnenko and Creative for some period of time.  Creative itself underscores the court's questions and concerns by its refusal to reveal the identity of the ultimate purchaser of the Lexus SUVs in Ukraine.

In answer to these questions, Creative presents only the testimony of Greg Katz, claiming the money was his by way of his "longstanding" customer Hazel U.K., and a transfer receipt, which shows only that the funds were wired to McGrath from Creative's account.  Katz's testimony and that of Farber, Przybylski, and Simon, and Defendant's evidence of an earlier wire transfer raises a dispute of fact as to where the wired funds originated and to whom they initially belonged.  The possibility of an earlier wire transfer to Creative from a bank in Cyprus, the uncertain links between Pychnenko and Creative, and the shadowy nature of Hazel U.K.'s role in the transaction all raise material questions of fact as to whether the disputed funds do indeed belong to Creative at all and whether Creative has an immediate, unconditional right to possess the monies.  As a result, Plaintiff has failed to persuade the court that it is entitled to judgment as a matter of law on its conversion claim.

### 2.    Illinois Consumer Fraud and Deceptive Business Practices Act

Creative claims McGrath violated the Illinois Consumer Fraud and Deceptive Business Practices Act by acting "with intent to defraud [Creative] by willfully ignoring [Creative's] repeated

claim of right to the money." (Compl. ¶ 70). The Illinois Consumer Fraud Act "is a regulatory and remedial statute intended to protect consumers, borrowers and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.,* 201 Ill.2d 403, 775 N.E.2d 951, 960 (2002), *quoted in Windy City Metal Fabricator & Supply, Inc. v. CIT Technology Financing Services, Inc.*, 536 F.3d 663 (7th Cir. 2008). The elements of a claim under the Act are: (1) a deceptive act or practice by the defendant;[14] (2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during the course of conduct involving trade or commerce. *Robinson*, 201 Ill.2d at 403, 775 N.E.2d at 960. The Act is to be liberally construed to effectuate its purpose. (*Id.*)

"As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991) (citing *Morissette v. United States,* 342 U.S. 246, 274 (1952)). The court sees no reason to depart from the general rule in this case. Viewing the evidence in the light most favorable to McGrath, Plaintiff has failed to establish that McGrath engaged in a deceptive act and that McGrath intended for Creative to rely on its deception.

Plaintiff presents no evidence that McGrath deceptively elicited the wire transfer. Nor does Plaintiff present evidence that McGrath and ITA conspired to dupe Creative. As Creative concedes, neither McGrath nor ITA had any contact whatsoever with Plaintiff prior to Creative's wiring $171,388 to McGrath's account accompanied by no written instruction other than the ambiguous words "FOR ITA," followed by two six digit numbers. If Plaintiff has a claim for deception, its likely target may be Pychnenko, the only participant in the transaction who ever made any

---

[14] The statute uses the singular form of the noun "act." Contrary to the assertions made in Defendant's reply, a single deceptive act is enough to establish a violation of the statute. There is no statutory requirement that a defendant conduct a series of deceptive practices in order to incur liability under Illinois law. *See, e.g., Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 503, 675 N.E.2d 584, 595 (1996)(a single alleged false representation was sufficient to adequately plead a violation of the Act).

representations to Creative.[15]  Creative had a contract with TVD Global and Pychnenko, not McGrath.  Creative wired the funds at Pychnenko's direction, not McGrath's.  Prior to the wire transfer, McGrath took no action at all with regard to Creative, deceptive or otherwise.

Indeed, the only evidence of "deception" Plaintiff offers is McGrath's failure to respond to Creative's requests to return the wire-transferred funds.  Assuming that Michael Simon's testimony is true—that McGrath received no notice of Plaintiff's claim to the funds until February 13, 2008; that McGrath, in the form of Simon, undertook a reasonable investigation of Plaintiff's claims once it became aware of them; and that McGrath cooperated with Plaintiff's counsel in an effort to resolve this dispute—a reasonable finder of fact could infer that McGrath neither acted to deceive Plaintiff nor possessed the requisite intent to deceive or defraud Plaintiff.  *See Geschke v. Air Force Ass'n*, 425 F.3d 337, 345 (7th Cir. 2005) (facts supporting deception and defendant's intent to deceive are required for judgment under the Illinois Consumer Fraud Act); *Dent-A-Med, Inc. v. Lifetime Smiles, P.C.*, No. 04 C 4780, 2008 WL 5423547, *5 (N.D.Ill. Dec. 29, 2008).  Further, the facts suggest that ITA may have had a valid lien against Pychnenko based on his outstanding debt.  If ITA and McGrath possessed a reasonable good-faith belief that the money likely originated with Pychnenko, as they claim, a trier of fact could conclude that McGrath acted reasonably under the circumstances.  At best, substantial questions of fact exist with regard to Defendant McGrath's actions and intent in this matter.

The record does not establish undisputed facts that require a judgment for Plaintiff as a matter of law.  The court denies Plaintiff's motion for summary judgment on this claim.

### 3.    Unjust Enrichment

A cause of action based on a theory of unjust enrichment under Illinois law requires a

---

[15]    The fact that Attorney Seiden, who represents Creative here, contacted McGrath on behalf of Pychnenko and TVD Global may be an indication that Creative does not intend to pursue those parties.

showing that the defendant has unjustly retained a benefit to the plaintiff's determent, and that defendant's retention of the benefit violates principles of justice, equity, and good conscience. *HPI Health Care Servs. Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989), *cited by Association Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 854 (7th Cir. 2007). "If that situation exists, quasi-contract mandates the imposition of an obligation upon the benefit receiver to avoid the unjust enrichment. The obligation imposed is an obligation to pay money to the benefit provider, an obligation 'closely akin to a duty to make restitution.'" *Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732, 737-38 (7th Cir. 1990) (internal citations omitted).

For reasons already mentioned, the court is not persuaded that McGrath's actions in this case violate principles of justice, equity, and good conscience. Substantial questions of fact exist about whether McGrath acted reasonably in investigating the origin and purpose of the transferred funds. Questions of fact exist about whether ITA held a valid lien against Pychnenko and whether McGrath received any benefit when ITA applied the funds to its account to satisfy an outstanding debt. Questions of fact even exist as to whether the disputed funds originated with and belong to Plaintiff. Recognizing that McGrath's own Rule 56.1 submission has been stricken, the court nevertheless acknowledges that possibility that equitable defenses, such as unclean hands, may bar Creative's recovery. The court concludes Plaintiff is not entitled to judgment on its unjust enrichment claim at the summary judgment stage.

## F.    Necessary Parties

Although it is not necessary for the disposition of Plaintiff's motion for summary judgment, the court notes the possibility that Valeriy Pychnenko and TVD Global are necessary parties to this action under FED. R. CIV. P. 19. The interactions between Plaintiff and Defendant that give rise to this dispute occurred solely through Pychnenko and TVD Global as intermediary. To the extent Plaintiff has any potential contractual or quasi-contractual claims, they would appear to apply with greatest force against TVD Global and Pychnenko, the only participant in the exchange with which

Creative actually contracted. Pychnenko, and no one else, directed Plaintiff to wire its money to McGrath's account. Notably, Defendant's arguments against summary judgment rest on the theory that Pychnenko used Creative to funnel money to ITA. Thus, the court may be unable to accord complete relief among the existing parties in Pychnenko's absence. The parties are directed to join Pychnenko as a party in this action and to secure full participation in the case from TVD Global, whose agent has already been served.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [68] is denied. Plaintiff's motion to strike Defendant's Local Rule 56.1 Response [98] is granted in part and denied in part. The court will strike Defendant's improper 56.1 Response from the record, but the court denies Plaintiff's motion to strike the attached affidavits. The parties are directed to serve and join Valeriy Pychnenko as a necessary party and to pursue a settlement.

ENTER:

Dated: November 4, 2009

REBECCA R. PALLMEYER
United States District Judge